UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

NATHAN C COOK,

    Plaintiff,

    v.

RON NEAL, et al.,

    Defendants.

Case No. 3:18-CV-836 JD

## OPINION AND ORDER

Defendants Julie Kolodziej, as Administrator of the Estate of Dr. Joseph M. Thompson (the "Estate") [1], and Defendant Kenneth Gann have both moved for summary judgment. (DE 214; DE 217.) Plaintiff Nathan Cook ("Cook") brought multiple claims under Section 1983, including one claim of deliberate indifference against Dr. Thompson for failure to timely diagnose and administer medical treatment (DE 64 ¶ 86) and one claim of breach of duty to protect against Defendant Gann. (*Id.* ¶ 79.) Cook also brought other claims against certain non-moving defendants.[2] For the reasons explained below, the Court grants the motions for summary judgment and dismisses both claims against the Estate and Gann.

**A.    Factual Background**

The facts, viewed in the light most favorable to Nathan Cook, as the non-moving party, are as follows.

---

[1] On October 27, 2020, the Court substituted Julie Kolodziej, as Administrator of the Estate of Dr. Joseph M. Thompson, for Dr. Joseph M. Thompson. (DE 141.)

[2] Defendants Ron Neal, Kevin Orme, Jason Nowatzke, Dylan Cabanaw, Jefferey Fizer, Adrianne Gordon, Derek Boyan, and James Meehan did not file motions for summary judgment.

Cook is a prisoner in the Indiana Department of Corrections ("IDOC"). (DE 229-1 ¶ 3.) He began his term of incarceration on March 24, 2014, and was transferred to Indiana State Prison ("ISP") on April 17, 2014. (*Id.*) From that transfer date, until May 11, 2016, Cook reported no health concerns to medical staff at ISP. (*Id.* ¶ 6.)

On May 11, 2016, Cook submitted a Healthcare Request Form indicating he was getting really dry skin, sores in his hair, and that his back was breaking out. (*Id.* ¶ 7.) Nurse Archanetta Collins evaluated Cook on May 12, 2016, for his dry skin and sores. (*Id.* ¶ 8.) Her examination revealed pruritic, peeling, and cracking of the skin, but no signs of infection. (*Id.*) She then referred Cook to the medical provider to receive medicated shampoo related to dandruff. (*Id.*) Nurse Collins evaluated Cook again on May 26, 2016. (*Id.* ¶ 9.) Similar to Cook's previous visit, her examination showed pruritic, peeling, and cracking of the skin, but noted increased redness and erythemic area with short well-defined shortly raised borders. (*Id.*) This time, Nurse Collins provided Cook with hydrocortisone cream and acetaminophen. (*Id.*)

On June 6, 2016, Nurse Practitioner Diane Thews saw Cook for a rash on his scalp, which he described as "itchy, scaly, seborrheic" and "worse" (DE 115-1 at 39–41.) Nurse Practitioner Thews assessed Cook as having "seborrheic dermatitis" of the scalp and prescribed him selenium sulfide shampoo. (*Id.*) On June 21, 2016, Cook asked on a "request for interview" form for more "A&D ointment," wrote that it was helping with his drying skin, but indicated the medicated shampoo was drying out his scalp and causing his hair to break off. (DE 214-2 at 2.) In response to this, Nurse Thews ordered more A&D ointment. (DE 115-1 at 45–47.)

Dr. Thompson examined Cook regarding his seborrheic dermatitis for the first time on August 30, 2016. (DE 229-1 ¶ 13.) Dr. Thompson re-prescribed the A&D ointment and noted the continuing prescription of selenium sulfide medicated shampoo. (*Id.*) At his next appointment

with Nurse Practitioner Thews, Cook indicated that the medicated ointment was helping. (*Id.* ¶ 14.) On January 25, 2017, Dr. Thompson saw Cook again for his scalp and re-prescribed the medicated ointment. (*Id.* ¶ 15.)

On March 25, 2017, Cook complained of trouble breathing, sweating, and pain radiating to his left shoulder. (*Id.* ¶ 16.) Dr. Thompson ordered an EKG, which then came back abnormal. At this point, Dr. Thompson ordered aspirin and nitroglycerin for Cook. (*Id.*) When Cook's symptoms still did not subside, Dr. Thompson ordered the nurse to start an IV and send Cook to St. Anthony Hospital. (*Id.*)

At the hospital, Cook underwent extensive cardiac testing, which determined that he had fluid built-up around his heart. (DE 214-3 at 15, 17–21, 27–30.) Physicians at the hospital then performed cultures on the fluid, which indicated "no bacterial growth," "no fungal elements," and the viral panel also came back as negative. (*Id.* at 30, 70, 117–118, and 132–133; 115-1 at 78.) During his stay, Cook also had a kidney biopsy performed, which "raise[d] the question of well differentiated carcinoma." (DE 115-1 at 67.) Doctors at St. Anthony Hospital originally planned to transfer Cook to Indiana University Hospital for further testing, but doctors at Indiana University Hospital declined and said further tests on Cook's kidneys could be done on an outpatient basis. (DE 214-3 at 21.)

After his discharge from St. Anthony Hospital, Cook was transferred to the Wabash Valley Correctional Facility, because it had an infirmary, while ISP did not. (DE 229-1 ¶ 19.) In May, further testing, including an MRI and a pathology report, favored a diagnosis of renal cell carcinoma, but further testing was needed to confirm this diagnosis. (*Id.* ¶¶ 22–23.) Finally, in June, the Indiana University Hospital confirmed the diagnosis of renal cell carcinoma and scheduled him for a laparoscopic nephrectomy. (DE 115-2 at 293; DE 115-3 at 9–10.) Physicians

also ordered a biopsy of Cook's mediastinal node during his kidney removal surgery. (DE 229-1 ¶ 25.) After the surgery, "pathology revealed clear . . . renal cell carcinoma." (DE 214-5 at 186.)

Cook was transferred back to ISP from Wabash Valley Correctional Facility on September 12, 2017. (DE 229-1 ¶ 28.) On October 6, 2017, Cook was referred to an infectious disease specialist by an Indiana University urologist due to Cook's concerns and complaints about histoplasmosis, but the urologist noted he saw no diagnosis of histoplasmosis in the medical records. (*Id.* ¶ 29.)

On November 24, 2017, Cook complained of chest pain and stomach pain. (*Id.* ¶ 30.) Dr. Thompson ordered an ECG, which came back as abnormal. (*Id.*) Dr. Thompson ordered aspirin and nitroglycerin and, when Cook's symptoms didn't improve after 30 minutes, ordered an IV line and sent Cook to the emergency department of St. Anthony's Hospital via ambulance. (*Id.*) At the hospital, a hospital physician indicated Cook might have heartburn and Cook was returned to ISP. (*Id.* ¶ 31.)

On November 29, 2017, Dr. Thompson evaluated Cook. (*Id.* ¶ 32.) Cook told Dr. Thompson that someone informed him he had histoplasmosis in March which was never treated. (*Id.*) In response to this, Dr. Thompson prescribed Zantac, ordered chest x-rays, and ordered blood tests. (*Id.*) The chest x-rays came back indicating no cardiopulmonary abnormality. (*Id.*) Another doctor, Dr. Nancy Marthakis, testified that a chest x-ray indicating no cardiopulmonary abnormalities are inconsistent with a diagnosis of histoplasmosis requiring medical intervention. (*Id.*)

Dr. Thompson then retired and Dr. Nancy Marthakis began evaluating Cook. (*Id.* ¶ 34.) After Cook was evaluated by Dr. Marthakis, she diagnosed him with seborrheic dermatitis, but ordered x-rays to rule out an exposure or active histoplasmosis due to Cook's *belief* he had

4

previously been previously diagnosed with histoplasmosis. (*Id.*) Dr. Marthakis ordered a chest x-ray, which again returned with no acute cardiopulmonary abnormality and was inconsistent with Cook's belief that he had histoplasmosis requiring medical intervention. (*Id.*) Another later x-ray again had a normal result. (*Id.* ¶ 39.) In May of 2018, Dr. Marthakis biopsied Cook's back and scalp, which confirmed that Cook's rash was caused by folliculitis. (*Id.* ¶ 37.) Folliculitis is not life threatening, does not pose a significant risk to a patient's overall health or well-being, and most often results in lesions and itchiness. (*Id.* ¶ 38.) Dr. Mathakis prescribed an antibiotic, which Cook then reported improved his condition. (*Id.*) Over the next two years, Cook's rash largely resolved and he did not submit any healthcare request forms related to his scalp. (*Id.* ¶ 40.)

Cook filed the instant action on October 10, 2018. (DE 2.) The Court granted Cook leave to proceed against Dr. Thompson for failing to provide him with adequate care for his skin condition in violation of the Eighth Amendment. (DE 63.) The Court also granted Cook leave to proceed against Deputy Warden Kenneth Gann for subjecting him to unsanitary living conditions in violation of the Eighth Amendment. (*Id.*) Cook alleged that these unsanitary conditions exposed him to infectious diseases such as histoplasmosis. (DE 64 ¶ 18.) Furthermore, Cook alleged he was diagnosed with histoplasma mycelia and histoplasma yeast as a result of being exposed to bird droppings. (*Id.* ¶ 44.) Cook also alleged that he was misdiagnosed with renal cell carcinoma and that his kidney was removed on "suspicion." (*Id.* ¶ 36.)

After his death, Dr. Thompson was substituted as a party for Julie Kolodziej, as Administrator of the Estate of Dr. Joseph M. Thompson (the "Estate"). (DE 141.) Both the Estate and Gann have moved for summary judgment on the claims brought against them. (DE 214; DE 217.) Cook responded to the motion brought by the Estate, but failed to respond to the motion

brought by Gann. (DE 229.) The Estate then filed its reply to Cook's response, making both motions ripe. (DE 230.)

B.  **Standard of Review**

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). There must be more than a mere scintilla of evidence in support of the opposing party's position and "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009); *Anderson*, 477 U.S. at 252. Instead, the opposing party must have "evidence on which the jury could reasonably find" in his or her favor. *Anderson*, 477 U.S. at 252.

C.  **Discussion**

Kenneth Gann and the Estate have filed motions for summary judgment on the respective claims brought against them. The Court will discuss each motion in turn.

6

*(1) Defendant Gann's Motion for Summary Judgment*

Gann argues he should be dismissed because Cook has presented no evidence of Gann's personal involvement. (DE 219 at 2.) In his statement of material facts, Gann asserts that Cook "never personally met with Defendant Gann and never wrote to him regarding his complaints with his living conditions." (DE 218 ¶ 4.) In support of this, Gann cites to testimony from Cook's deposition. In his deposition, Cook testified that he did not "know if [Gann] was actually responsible for [sanitation at ISP] . . . ." (DE 217-1 at 126:9–13.) Cook also testified that he never wrote to Gann personally and that he was "assuming" that somebody made Gann aware of the sanitation issues. (*Id.* at 126:21–127:4.) Cook has failed to respond to Defendant Gann's motion for summary judgment and the time for a response has passed. Therefore, Cook has conceded Gann's version of events. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); N.D. Ind. L.R. 56-1(b) ("A party opposing the motion must, within twenty-eight days after the moving party served the motion, separately file . . . (1) a response brief; and (2) a Response to Statement of Material Facts . . . .").

With claims brought under § 1983, a defendant must be "personally responsible for the deprivation of a constitutional right" to be individually liable. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). Respondeat Superior does not apply. *Id.* An official can be held personally responsible if he knew about the conduct that caused the constitutional violation and "facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). By pointing out that Cook has no evidence of Gann's personal involvement, Gann has met his initial burden at summary judgment. *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (explaining that if a party chooses to argue that there is an

7

absence of evidence supporting an essential element, the burden is not "onerous" and "may be discharged by 'showing' —that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"). The burden then shifts to Cook to present specific facts showing a genuine material issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley Cty. REMC*, 840 F.2d 405, 410 (7th Cir. 1988).

Cook has presented no evidence that Gann knew about the unsanitary conditions or that he turned a blind eye to them. In fact, Cook testified that he "assumed" that someone made Gann aware of the unsanitary conditions. Accordingly, the Court grants Gann's motion for summary judgment, as there is no genuine dispute regarding his personal involvement.

*(2) The Estate's Motion for Summary Judgment*

Next, the Court considers the Estate's motion for summary judgment. The Estate argues that the undisputed expert testimony in this case establishes that Dr. Thompson treated Cook reasonably, appropriately, and within the standard of care. (DE 216 at 6.) According to the Estate, Dr. Thompson properly evaluated Cook when he first came in, diagnosing him with seborrheic dermatitis and prescribing A&D ointments and medicated shampoo. (DE 230 at 3–5.) The Estate also asserts that when Cook complained of trouble breathing and chest pain, Dr. Thompson ordered the proper tests and then transferred him to the hospital, where it was determined he had renal cancer. (*Id.*)

In his response, Cook argues that Dr. Thompson was deliberately indifferent for two reasons. First, Cook argues that Dr. Thompson's failure to provide Cook with an effective treatment for his rash and refusal to refer him to a specialist constituted deliberate indifference. (DE 229 at 2–3.) Second, Cook argues that because a jury could infer that Plaintiff had histoplasmosis, they could also infer that Dr. Thompson was deliberately indifferent. (*Id.*)

The Court finds that no reasonable jury could find that Dr. Thompson was deliberately indifferent to Cook's medical issues. "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016). Because Cook has failed to present evidence from which a reasonable jury could find Dr. Thompson deliberately indifferent, the Court assumes for the sake of analysis that Cook's skin condition was objectively serious.

With regard to the deliberate indifference prong, the plaintiff must show that the official "acted with the requisite culpable state of mind." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). When it comes to prison medical professionals who are alleged to prove *inadequate* treatment, in contrast to no treatment, the deliberate indifference inquiry is especially difficult. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). There must be something more than mere medical negligence or disagreement with the doctor's medical judgment. *Id.* The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Zaya v. Sood*, No. 15–1470, 836 F.3d 800, 805–06, 2016 WL 4621045, at *3 (7th Cir. Sept. 6, 2016). This type of question, regarding whether treatment was adequate, usually requires expert testimony. *Greeno v. Daley*, 414 F.3d 645, 658 (7th Cir. 2005) (explaining that a claim requiring "an assessment of the adequacy of the treatment that [the plaintiff] did receive" would "likely require expert testimony").

9

Cook has failed to present any evidence from which a reasonable jury could find that Dr. Thompson's treatment was not based on a professional judgment. First, he has presented no evidence from which a reasonable jury could conclude that Dr. Thompson failed to timely diagnosis him with histoplasmosis. Plaintiff's own expert, Dr. Won Chung, provided answers in an interrogatory which support that Cook may have never had histoplasmosis. For example, in response to the question "did Nathan Cook display any symptoms of bird transmitted diseases," Dr. Chung responded that "patient did not have symptoms of systemic infection such as fever, chills, and weight loss" and did not have other respiratory symptoms or neurologic symptoms consistent with bird transmitted diseases. (DE 214-6 at 3–4, 8–9.) While Cook asserts that "[he] had a positive test result for histoplasmosis" (DE 229 at 3), Dr. Chung wrote that "[t]he diagnosis of histoplasmosis remains inconclusive since multiple tissue biopsies and cytology did not show any fungal elements, hence, the only test that was positive was the complement fixation test which needs caution for interpretation." (DE 214-6 at 9.) In other words, according to Plaintiff's own expert, the positive complement fixation test alone was not enough to conclude he had histoplasmosis. Dr. Chung also consistently gave answers indicating that the proper tests were performed on Cook. In response to the question, "should any of [Cook's] treating doctors have done further tests," Dr. Chung responded by writing that Cook "was tested properly for cryptococcus, histoplasma, [and] blastomycosis." (*Id.*) Then, in response to the question, "has Nathan Cook had the appropriate tests performed," Dr. Chung responded by writing that "the patient had the appropriate tests performed." (*Id.*) Finally, Dr. Chung noted that Cook had been "accurately diagnosed and treated for early-stage renal cell carcinoma" and that he could not "recommend treatment for Histoplasmosis since diagnosis [was] inconclusive." (*Id.*) There is simply no evidence presented that Dr. Thompson failed to exercise professional judgment by not

diagnosing or treating Cook for histoplasmosis. On the contrary, Plaintiff's very own expert provided answers indicating that Dr. Thompson acted appropriately.

Likewise, no reasonable jury could find that Dr. Thompson failed to exercise professional judgment when treating Cook's skin condition. When Dr. Thompson examined Cook on August 30, 2016, he prescribed him A&D ointment and continued the prescription for medicated shampoo. (DE 229-1 ¶ 13.) After this point, Cook indicated that the medicated ointment was helping and requested a renewal. (*Id.* ¶ 14.) On January 25, 2017, Dr. Thompson saw Cook again for his dry flaking scalp and Dr. Thompson re-prescribed the medicated ointment. (*Id.* ¶ 15.) Cook does not cite to any other portion of the record indicating that Dr. Thompson met with Cook on other occasions to discuss his skin condition.

Cook has presented no evidence from which a reasonable jury could find that Dr. Thompson's course of treatment for Cook's skin condition was not based on Dr. Thompson's professional judgment. Cook simply opines that "over the course of almost a year, May 2016 until March 2017, Dr. Thompson continued to give Plaintiff an ointment and shampoo that was not improving Plaintiff's condition" and that Dr. Thompson refused Plaintiff's request for a specialist multiple times. (DE 229 at 2–3.) However, Cook does not cite any evidence in support of this assertion. (*Id.*) Instead, the uncontested evidence supports that Dr. Thompson met with Cook twice about his skin condition, on August 30, 2016, and January 25, 2017, and that between these points Cook reported that his skin condition was improving. The other care that Dr. Thompson provided was focused on responding to Cook's symptoms unrelated to his skin, including trouble breathing, which, upon being sent to the hospital, were determined to be related to fluid around Cook's heart, renal cancer, and heartburn, not his skin condition. (229-1 ¶¶ 15,

11

16, 17, 30, 31.) Cook does not direct the Court to any other portion of the record which could support a finding that Dr. Thompson was not exercising professional judgment.

Furthermore, this case does not resemble other cases where courts have found a prison medical doctor to be deliberately indifferent. This is not the case where a doctor persisted in a course of treatment that was known to be ineffective. *Petties*, 836 F.3d at 730. ("Another situation that might establish a departure from minimally competent medical judgment is where a prison official persists in a course of treatment known to be ineffective."). Here, Cook reported that his skin condition was improving after being given the A&D ointment. Dr. Thompson only met with him one other time concerning his skin issues, which occurred shortly after Cook indicated said improvement.

Nor is this the case of a doctor knowingly delaying treatment. *Petties*, 836 F.3d at 730 ("Yet another type of evidence that can support an inference of deliberate indifference is an inexplicable delay in treatment which serves no penological interest."). For example, in *Conley v. Birch*, the Seventh Circuit found a material issue of fact regarding deliberate indifference where the doctor only provided painkillers and ice to an inmate suffering from a suspected fracture. 796 F.3d 742, 747 (7th Cir. 2015). In that case, the plaintiff had hired a medical expert to opine that the "appropriate" treatment involved in such a situation required using a splint and ordering x-rays. *Id.* at 746. The court found that a jury could find that the doctor was deliberately indifferent because he refused "either to promptly evaluate Conley's condition (by ordering an x-ray or performing an in-person exam) or to provide appropriate precautionary treatment (by immobilizing his hand)." *Id.* at 748. Unlike *Conley*, the evidence here indicates that Dr. Thompson (1) promptly diagnosed his skin condition, and (2) provided treatment which Cook

indicated was helping. Finally, unlike *Conley*, Cook has presented no expert witness who disagrees with the care provided by Dr. Thompson.

Because there is no evidence that Dr. Thompson (1) knew his treatment was ineffective or (2) that his treatment was a substantial departure from the norm, the Court finds that no reasonable jury could find Dr. Thompson deliberately indifferent for failing to properly treat Cook's skin condition. *See Davis v. Kayira*, 938 F.3d 910, 915 (7th Cir. 2019) (explaining that summary judgment is warranted where there was "no evidence [suggesting that a doctor] knew his diagnosis was wrong or that the treatment he prescribed would be ineffective" and that "there was no expert testimony suggesting the doctor's actions were a substantial departure from the norm."). Accordingly, summary judgment on this claim is warranted in favor of the Estate.

**D.    Discussion**

For the reasons stated above, the Court GRANTS both motions for summary judgment. (DE 214; DE 217.) The Court DISMISSES Julie Kolodziej, as Administrator of Dr. Thompson's Estate, and Kenneth Gann from this suit, as no claims remain against them. The case proceeds against the remaining defendants.

SO ORDERED.

ENTERED: December 19, 2022

                                                /s/ JON E. DEGUILIO
                                                Chief Judge
                                                United States District Court